OPINION OF THE COURT
Saxe, J.
Plaintiff Aetna Life Insurancé Company alleges that defendants directed and arranged the removal from a trust account held for Aetna’s benefit of $48.65 million of high-grade securities that were trading at or near par value, and their replacement with toxic, “sticky” subprime-mortgage-backed securities that were actually worth a small fraction of that amount, which securities had been held in the inventory of Lehman Brothers Holding, Inc. (LBHI). Aetna asserts that defendants did so as part of an effort to prop up Lehman Brothers’ financial position in the final days prior to its 2008 collapse. The complaint al *36 leges causes of action for breach of the Connecticut Unfair Trade Practices Act (CUTPA) (Conn Gen Stat § 42-110b [a] et seq.); breach of fiduciary duty; negligence; and recklessness. We affirm the determination of the motion court holding that the allegations are sufficient to support each of the causes of action, and modify only to the extent of denying dismissal of the negligence claims against the individual defendants.
According to the complaint in each of the two (subsequently consolidated) actions at issue here, Lehman Re, Ltd., a wholly-owned subsidiary of LBHI, entered into a coinsurance agreement with Aetna, under which Lehman Re agreed to reinsure a block of fully paid-up life insurance policies that had been issued by Aetna, and to indemnify Aetna for all benefits paid by Aetna on the reinsured policies. In consideration for this indemnification obligation, Aetna paid Lehman Re a premium of $155,667,717, which was deposited in a trust account, to be held for Aetna’s benefit. Under a contemporaneously executed trust agreement, Lehman Re, with Bank One Trust Company, as trustee, agreed to manage the assets in the trust account as security for Lehman Re’s indemnity obligations. The agreement between Aetna and Lehman Re required Lehman Re to direct the trustee to invest trust account assets in specified types of “eligible securities,” defined as cash, certificates of deposit and certain types of investments permitted by the Connecticut Insurance Code; Lehman Re was authorized to withdraw assets from the trust account without Aetna’s approval provided that the assets were replaced with other qualified assets.
However, Aetna alleges, pursuant to a longstanding investment advisory agreement between Lehman Re and defendant Appalachian Asset Management Corp. — a company which, like Lehman Re, was also a wholly-owned subsidiary of LBHI — Appalachian was given the authority to control and manage the assets in the Aetna trust account. That investment advisory agreement, Aetna says, gave Appalachian trading authority over the trust account assets.
The crux of the complaint is that on September 9, 2008, with the real estate market in crisis and the market for mortgage backed securities drying up, Appalachian arranged for the removal from the Aetna trust account of $48.65 million of high-grade, CARAT securities that were trading at or near par value. In place of those valuable securities, Appalachian directed the substitution of securities then held in the inventory of LBHI with a purported face value of $44,500,000, issued by Bailan *37 tyne Re PLC and backed by subprime residential mortgage loans. Defendants allegedly knew that the Ballantyne Re securities were, in fact, “sticky,” or highly illiquid, with an actual value that was a fraction of their face value. They also allegedly knew that the Ballantyne Re securities were not of a quality required of securities maintained in the trust account under the trust agreement. The substitution was allegedly performed without Aetna’s knowledge or consent.
Aetna’s complaint further provides context for the troubling transaction, explaining that in early 2008, LBHI had recognized its problematic financial position, in that it was over-leveraged, with excessive “sticky” inventory positions that would be difficult to sell without incurring substantial losses or creating a loss of confidence in the inventory remaining on its balance sheet. LBHI was therefore attempting to take steps to make its financial position appear stronger than it actually was. Additionally, Aetna asserts that J.E Morgan made a demand on LBHI in September 2008 to post an additional $3.6 billion in collateral to secure certain funding, to which demand LBHI agreed on September 9, 2008, the same date that the substitution was directed.
In any event, the substitution made in Aetna’s trust account on September 9, 2008 was allegedly arranged on behalf of LBHI not only to increase the quantity and value of assets on LBHI’s books, but to substantially reduce the amount of “sticky” assets on its books at a time when future funding and support were in question.
On September 15, 2008, LBHI filed for bankruptcy protection. Lehman Re commenced liquidation proceedings in Bermuda on September 23, 2008, and Aetna filed a proof of claim for its loss in that proceeding. Aetna’s quantified loss was incurred because on September 19, 2008, it determined that the Ballantyne securities then held in its trust account were of a type that it was not permitted to carry on its books as admitted assets, because they did not meet the requirements of Connecticut insurance law. Accordingly, on October 14, 2008, Aetna sold the Ballantyne securities, at a price of $4.8 million, almost $44 million less than the value of the securities in the trust account for which they had been substituted five weeks earlier.
According to Aetna’s complaint, a number of individuals were involved in Appalachian’s control and management of the assets in the Aetna trust account. These individuals included: non-appealing defendant Gregory McDonald, an assistant vice- *38 president in LBHI’s fixed income division; defendant William Messmore, an officer of Appalachian and a member of the insurance products group at LBHI; defendant Douglas McBeth, president and board member of Lehman Re and head of the insurance group at LBHI; and defendant Sameer Garg, board member of Lehman Re and member of the insurance group at LBHI. It is alleged that all these individuals knew that Aetna was the beneficiary of the trust account, and that the assets in the account were required to be invested in a conservative manner, subject to limitations imposed by the trust agreement and the requirements of the Connecticut Insurance Code.
Plaintiff claims that the particular transaction in question was instigated by an email from defendant Christopher McDougal, a vice-president in the fixed income division of Lehman Brothers, Inc. (LBI), another wholly-owned subsidiary of LBHI, in which McDougal designated the specific securities to be removed from Aetna’s trust account and the specific securities then held by LBHI to be substituted for them. Shortly after receiving this email from McDougal, McDonald forwarded it to the trustee and directed the trustee to remove the CARAT securities from the trust account and substitute the Ballantyne Re securities.
In seeking dismissal, Appalachian argued that the alleged facts did not state a violation of CUTPA. It also argued that whatever duty Lehman Re might have owed to Aetna under the coinsurance agreement and trust agreement, Appalachian owed no fiduciary duty to Aetna, and therefore breached no such duty. Indeed, Appalachian argued that it owed no duty at all to Aetna, requiring dismissal of the negligence and recklessness causes of action as well. Appalachian characterizes what happened to Aetna as merely “an arms-length business transaction between two sophisticated entities — Aetna and non-party Lehman Re — that resulted in a loss during the height of a terrible economic crisis.”
The individual defendants each moved for dismissal as well, arguing, like Appalachian, a lack of any duty. In addition, defendant Garg asserted as a factual matter that he played no role in controlling or managing the assets in the trust account, and, specifically, played no role in the substitution at issue; his motion also sought, in the alternative, summary judgment dismissing the claims against him.
The motion court denied the motions to dismiss, except to the extent it dismissed the negligence claims as against the individ *39 nal defendants; it also denied Garg’s motion for summary judgment. Aetna’s motion to consolidate the separate action it brought solely against Christopher McDougal with the action against Appalachian and the other individual defendants was also granted; in addition to the consolidation of two separate complaints into one complaint, the motion court observed that the proposed consolidated amended complaint sought to add allegations demonstrating that defendants knew or should have known that the Ballantyne Re securities were unsuitable for substitution into the trust account.
Discussion
As an initial matter, we reject Aetna’s contention that its service of the consolidated amended complaint renders defendants’ appeals moot. While an appeal taken from a denial of a dismissal motion may be moot when that complaint has been superseded by an amended complaint (see e.g. 100 Hudson Tenants Corp. v Laber, 98 AD2d 692 [1st Dept 1983]; Bennett v City of New York, 65 AD2d 731, 732 [1st Dept 1978]), that is not necessarily the case where the new pleading does not substantively alter the existing causes of action (see e.g. Anthony J. Demarco, Jr., P.C. v Bay Ridge Car World, 169 AD2d 808 [2d Dept 1991]). Here, Aetna acknowledged that the consolidated amended complaint, which primarily combined the complaint against Mc-Dougal with that against the remaining defendants, alleged no new claims or theories of recovery, but merely added more detail as to what defendants allegedly knew or should have known about the value of substituted securities. The legal issues raised on these appeals, relating to whether a CUTPA claim lies or whether there is a basis to hold defendants liable in tort given the nature of their relationships with plaintiff, may be fully addressed at this stage based on the pleadings before the motion court, and are not altered by the additional factual allegations. CUTPA
Defendants all contend that the allegations of the complaints cannot support the CUTPA claim against any defendant. They point out that in Russell v Dean Witter Reynolds, Inc. (200 Conn 172, 175, 510 A2d 972, 974 [1986]), the Connecticut Supreme Court held that “CUTPA does not apply to the purchase and sale of securities,” which are covered instead by the Connecticut Uniform Securities Act (CUSA) (Conn Gen Stat § 36b-2 et seq.).
However, as the motion court observed, the record does not specify exactly how such a “substitution” was carried out. Noth *40 ing in the record establishes a purchase or sale of securities. Rather, it appears that, essentially, LBHI arranged to take highly valuable assets from Aetna’s account and place those assets on its own books, while removing from its own books assets that were actually damaging to LBHI’s financial position, and purporting to replace Aetna’s valuable assets with the toxic ones.
It is true that Connecticut law defines a “sale” of securities to include any “contract of sale of, contract to sell, or disposition of, a security or interest in a security for value” (see Conn Gen Stat § 36b-3 [16] [A] [emphasis added]). However, on the record before us, we are unable to conclude, as a matter of law, that the transaction here may accurately be termed such a “disposition” of securities for value, particularly since it appears that LBHI gained both from the removal of the Ballantyne securities and from the addition of the CARAT securities. Indeed, the alleged transaction is arguably closer to a claim of mismanagement, and as such would fall within the application of CUTPA (see Mossberg v Union Trust Co., 1994 WL 228337, 1994 Conn Super LEXIS 1236 [1994]). We are therefore unable to determine at this juncture, as a matter of law, whether the so-called “substitution” is the type of transaction covered by CUTPA rather than CUSA.
Assuming that CUTPA does apply, we must determine whether the elements of such a claim are sufficiently stated by the complaints.
A cause of action under CUTPA is stated where
“(1) . . . the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) . . . it is immoral, unethical, oppressive, or unscrupulous; [or] (3) . . . it causes substantial injury to consumers, [competitors or other businesspersons]” (Hartford Elec. Supply Co. v Allen-Bradley Co., Inc., 250 Conn 334, 368, 736 A2d 824, 842-843 [1999] [internal quotation marks omitted]).
Contrary to the arguments of defendants McBeth and Garg, Connecticut law does not require that CUTPA claims be pleaded with particularity (see Macomber v Travelers Prop. & Cas. Corp., 261 Conn 620, 644, 804 A2d 180, 196 [2002]). The allegations *41 made here are sufficient to satisfy the test for pleading purposes. They assert more than mere negligence in making a trade; they assert conduct that surely may he deemed unscrupulous, unfair, and violative of the public policy “as it has been established by” Connecticut insurance law and regulations (Hartford Elec. Supply Co., 250 Conn at 368, 736 A2d at 843 [internal quotation marks omitted]). While any of the defendants are free to take the position in the course of the litigation that, in fact, his (or its) acts were merely negligent, the facts as alleged assert far more.
As to protests by the individual defendants that they may not be individually liable for CUTPA violations, the Appellate Court of Connecticut observed that a corporate officer who directly engaged in tortious conduct was properly held individually liable for CUTPA violations (see Cohen v Roll-A-Cover, LLC, 131 Conn App 443, 469, 27 A3d 1, 18 [2011], certification for appeal denied 303 Conn 915, 33 A3d 739 [2011]). The reasoning of that case supports the possibility of the individual defendants here being held liable under CUTPA, if they directly engaged in tortious conduct injuring Aetna.
Fiduciary Duty
All of the defendants contend that no breach of fiduciary duty may properly be asserted against Appalachian, and the individual defendants claim that no aiding and abetting such a breach may be pleaded against them, because there was no fiduciary relationship between Aetna and Appalachian, and any such duty owed to Aetna was owed by Lehman Re alone. However, while Aetna did not have a contractual relationship with Appalachian, the allegations permit a finding that Appalachian stepped into Lehman Re’s position as created by the trust agreement, knowing of the trust agreement’s provisions and limitations, thereby assuming Lehman Re’s duties, including the specified obligations regarding the handling of Aetna’s trust account. A fiduciary relationship “is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other” (Hi-Ho Tower, Inc. v Com-Tronics, Inc., 255 Conn 20, 38, 761 A2d 1268, 1278 [2000] [internal quotation marks omitted]). It is alleged that Appalachian, through its representatives, formed a direct relationship with Aetna, in which Appalachian was in the dominant position, asserting influence over Aetna and creating justifiable trust on Aetna’s part (see Alaimo v Royer, 188 Conn 36, 41, 448 A2d 207, 209 [1982]).
*42 Whether or not the evidence establishes that direct interactions between Appalachian and Aetna over almost a decade defined or adjusted the terms of their relationship, the circumstances as alleged are enough to, at least, avoid dismissal, since they support a possible finding that the fiduciary obligations initially undertaken by Lehman Re were later undertaken by Appalachian. Defendants’ assertion that Aetna was unaware of Appalachian’s existence until after the complaint was filed may support a finding contrary to Aetna, but allegations that Aetna had numerous communications with Garg and others involved in managing the trust account on behalf of Appalachian, and that Aetna was convinced to place its trust and confidence in those managers, preclude dismissal based on Aetna’s claimed unawareness of Appalachian’s existence.
The claim of aiding and abetting a breach of fiduciary duty is also upheld as against the individual defendants. Liability for aiding and abetting a breach of fiduciary duty requires establishing the following elements:
“(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation” (Halberstam v Welch, 705 F2d 472, 477 [DC Cir 1983]; see Efthimiou v Smith, 268 Conn 499, 505, 846 A2d 222, 226 [2004]).
Here, plaintiff alleges that each individual defendant knew of the substitution and its impropriety, and played some role in effecting the securities swap; whether or not the assistance provided may be categorized as substantial cannot be determined here. McDougal allegedly directed the substitution in question; Messmore, McBeth, and Garg are all alleged to have been aware of Appalachian’s actions and to have taken actions substantially assisting the alleged breach of fiduciary duty. The allegation that they participated in controlling and managing the trust account assets is sufficient to satisfy the pleading requirement. Moreover, as to Garg in particular, Aetna states that he, personally, was specifically informed by Aetna that the trust account must comply with Connecticut insurance regulations.
Negligence and Recklessness
To state a claim for negligence, a plaintiff must sufficiently allege (1) a duty; (2) a breach of that duty; (3) causation; and *43 (4) actual injury (see RK Constructors, Inc. v Fusco Corp., 231 Conn 381, 384, 650 A2d 153, 155 [1994]). In Connecticut,
“[a] duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act” (see Coburn v Lenox Homes, Inc., 186 Conn 370, 375, 441 A2d 620, 624 [1982]), and where a determination is made that the defendant’s responsibility should extend to such results (RK Constructors, 231 Conn at 386, 650 A2d at 156).
“[T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant’s position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant’s responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case” (Neuhaus v DeCholnoky, 280 Conn 190, 217-218, 905 A2d 1135, 1152 [2006] [internal quotation marks omitted]; see also Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc., 80 AD 3d 293, 306 [1st Dept 2010], affd 18 NY3d 341 [2011]).
As the motion court held, although Aetna’s agreement was with Lehman Re, the allegations permit a finding that Appalachian assumed a duty of care to Aetna in connection with the management of the trust account assets. Appalachian’s denial of any duty to manage the assets in a reasonable manner fails to negate the inference that may be drawn from the allegations.
In addition, Connecticut allows for liability in tort of a corporate officer or agent who engages in the tortious conduct (see Sturm v Harb Dev., LLC, 298 Conn 124, 133-134, 2 A3d 859, 867 [2010]). Plaintiffs allegations that each of these individual defendants took actions in connection with the substitution that they knew were not reasonably prudent with respect to the management of the trust assets are sufficient to state claims for negligence.
*44 The allegations in the complaint also reasonably support the recklessness cause of action against all defendants (see Carney v Federal Express Corp., 2003 WL 1228080, *2-3, 2003 Conn Super LEXIS 619, *7-9 [2008]). While “[m]erely using the term ‘recklessness’ to describe conduct previously alleged as negligence is insufficient as a matter of law” (Angiolillo v Buck-miller, 102 Conn App 697, 705, 927 A2d 312, 319 [2007], certification for appeal denied 284 Conn 927, 934 A2d 243 [2007]), here plaintiff alleges that defendants’ conduct in participating in the substitution that placed toxic assets into the trust account “involved a risk substantially greater than that which would be necessary to make their conduct negligent,” and was “willful, wanton, reckless, highly unreasonable, and involved an extreme departure from ordinary care.” Where the facts in the complaint reasonably support a claim of recklessness, they will be considered sufficient, even though they are largely duplicative of the statements in the negligence count (see Carney, 2003 WL 1228080, *3, 2003 Conn Super LEXIS 619, *8-9).
Summary Judgment
Garg argues that he is entitled to summary judgment based on his unrebutted affidavit testimony establishing that he had no role in controlling or managing assets in the trust account, played no role in the substitution, was not even aware it had taken place, and was a mere intermediary between plaintiff and LBHI’s investment department. He further relies on McDougal’s deposition testimony as confirming that he did not direct the substitution, as well as the deposition testimony of LBI’s Thomas Rogers, who indicated that Lehman mortgage traders directed substitutions. In addition, Garg maintains that a genuine issue of fact is not raised by the statement of John Sullivan, an employee of plaintiff, that he had “a series of telephone conferences with Mr. Garg and other individuals whom [he] understood were involved in the management of the Trust Account.” Finally, Garg argues that plaintiff failed to make the required showing under CPLR 3212 (f) that summary judgment was premature because more discovery is needed.
The motion court properly denied Garg’s summary judgment motion as premature, since facts essential to the opposition may exist but could not have then been provided.
Finally, the motion court properly granted Aetna’s motion to consolidate the two actions.
We have considered the parties’ remaining arguments and find them unavailing.
*45 Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered April 13, 2012, which, to the extent appealed from, denied defendant Appalachian Asset Management Corp.’s motion to dismiss the complaint as against it, granted defendants Messmore, McBeth and Garg’s motions to dismiss the negligence cause of action as against them, and denied their motions to dismiss the causes of action for violation of section 42-110b (a) of the Connecticut Unfair Trade Practices Act (CUTPA), aiding and abetting Appalachian’s alleged breach of fiduciary duty, and recklessness, denied defendant Garg’s motion for summary judgment dismissing the complaint as against him, and granted Aetna’s motion to consolidate this action with a related action and to file a consolidated amended complaint, should be modified, on the law, to deny the motions to dismiss the negligence cause of action as against the individual defendants, and otherwise affirmed, without costs. The order of the same court and Justice, entered on or about May 8, 2012, which denied the motion of defendant Christopher McDougal to dismiss the claims for negligence, recklessness, aiding and abetting defendant Appalachian’s breach of fiduciary duty, and for a CUTPA violation, should be affirmed, without costs.
Mazzarelli, J.E, Acosta, Renwtck and Clark, JJ., concur.
Order, Supreme Court, New York County, entered April 13, 2012, modified, on the law, to deny the motions to dismiss the negligence cause of action as against the individual defendants, and otherwise affirmed, without costs. Order, same court, entered on or about May 8, 2012, affirmed, without costs.